**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DR. FREDERICK WILLIAM "ERIC" CUBIN, III,

     Plaintiff - Appellant,

v.

MARK GORDON, in both his personal and official capacities as Governor of Wyoming,

     Defendant - Appellee.

------------------------------

AMERICA'S FRONTLINE DOCTORS; DR. SIMONE GOLD,

     Amici Curiae.

No. 25-8021
(D.C. No. 1:24-CV-00164-SWS)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ** and **FEDERICO**, Circuit Judges, and **ALLEN**, District Judge.[**]
_____

When Dr. Eric Cubin sent an email to Wyoming legislators criticizing a prominent medical society and its position on a pending bill, he did what the First

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. _See_ Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[**] The Honorable Ann Marie McIff Allen, United States District Judge for the District of Utah, sitting by designation.

Amendment "encourage[s]": he engaged in "political debate." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988). His words echoed loudest in the governor's office. Governor Mark Gordon had appointed Cubin to the state board that oversees medical licenses, and he was concerned that the email's partisan language would undermine public confidence in the board's impartiality. So Gordon wrote Cubin to remove him from the board, and Cubin subsequently tendered his resignation, which Gordon accepted.

Cubin sued Gordon in his personal and official capacities for First Amendment retaliation under 42 U.S.C. § 1983 and for violating the Wyoming constitution's parallel free-speech guarantee, invoking *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The *Garcetti*/*Pickering* framework applies when "the government seeks to curtail the speech of its employees." *Lane v. Franks*, 573 U.S. 228, 236 (2014). In broad terms, it asks us to balance the employee's personal interest in speaking "on matters of public concern" against "the government's countervailing interest in controlling the operation of its workplaces." *Id.* at 235–36.

Under that standard, the district court held that Cubin's complaint failed to state a § 1983 claim for First Amendment retaliation on two independent grounds: (1) his criticism of the medical association was "not a matter of [public] concern," and (2) the government's interest in "promoting efficiency" outweighed Cubin's expressive rights. App. vol. 1, 254–55. The district court also granted Gordon

qualified immunity in his personal capacity and declined supplemental jurisdiction over the state-law claim.

We affirm in part and reverse in part. Because Cubin's email addressed a matter of public concern and weighing the interests was premature, we reverse the district court's determination that Cubin failed to state a claim. But because our precedent does not clearly establish Cubin's right to relief, we affirm the grant of qualified immunity. Accordingly, we affirm judgment on the § 1983 claims against Gordon in his personal capacity, reverse and remand the § 1983 claims against him in his official capacity, and invite the district court to reconsider supplemental jurisdiction over the state-law claim.

## Background[1]

In early 2024, Gordon appointed Cubin to a four-year term on the Wyoming Board of Medicine (the Board). The Board oversees medical professionals in the state and has statutory authority to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate[,] or renew licenses to practice medicine." Wyo. Stat. Ann. § 33-26-202(b)(i). As part of that responsibility, board members investigate complaints and adjudicate disciplinary actions against licensed physicians. Members serve "at the pleasure of the governor" unless, among other things, they are "removed by the governor" or resign. *Id.* § 33-26-201(a), (d)(iii), (d)(iv).

---

[1] Given the posture, we recite the facts as alleged in the complaint and attached exhibits.

Around the time of Cubin's appointment, the Wyoming legislature was considering Senate File 99, or "Chloe's Law," a bill banning certain gender-affirming medical procedures for minors. The Wyoming Medical Society (the Society), a professional organization representing the state's medical practitioners, opposed the bill. According to Cubin, the Society "partnered with" Dr. Michael Sanderson, president of the Wyoming chapter of the American Academy of Pediatrics to lobby against Chloe's Law. App. vol. 1, 30. Sanderson's legislative testimony "delivered the [American Academy of Pediatrics'] position" on gender-affirming-care restrictions and urged lawmakers "not [to] do anything to interfere with the doctor[-]patient relationship." *Id.* at 30, 31.

Cubin—himself a member of the Society—disagreed with its public position on Chloe's Law. After expressing his concerns to Society leadership, Cubin sent an email on February 28, 2024, from his personal account to all members of the Wyoming House of Representatives. He advised legislators that:

> [U]nder their current leadership, the . . . Society has been essentially hijacked by the far left. It seems that they have decided to prioritize politics over their stated mission of physician advocacy. In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members.

*Id.* at 30. Cubin's email went on to fault the Society for not "poll[ing its members] on their opinions of [g]ender[-a]ffirming [c]are." *Id.* at 31 (cleaned up). And it criticized Sanderson for highlighting in his testimony the position of the American Academy of Pediatrics but not that of the American College of Pediatricians, a separate society

4

opposed to "the social affirmation, medical intervention, or surgical mutilation of children and adolescents identifying as transgender or gender nonconforming." *Id.* at 30.

Cubin's email did endorse, as a general matter, Sanderson's testimony that government shouldn't interfere in the doctor-patient relationship. But Cubin argued that the potential "negative effects" of gender-affirming care warranted an exception to that rule. *Id.* at 31. He told legislators that Chloe's Law is a "good bill" and asked them not to "kill it, combine it, or amend it into oblivion." *Id.*

Chloe's Law passed, and Gordon signed it into law in late March. *See* Wyo. Stat. Ann. § 35-4-1001.

Then, in an April 22, 2024 letter, Gordon told Cubin, "I believe it is best to remove you from the Board." App. vol. 1, 33. Gordon wrote that he "ha[d] been made aware of [Cubin's] email to the members of the House of Representatives" in which Cubin had "strongly encouraged the members to pass [Chloe's Law] and criticized . . . the Society's opposition to the bill." *Id.* Gordon assured Cubin that he "appreciate[d his] position on this issue and respect[ed his] right to impart it to the [l]egislature." *Id.* But "it is important," Gordon wrote, "that the professionals governed by the Board . . . have confidence that [B]oard members prosecute their responsibilities on the [B]oard in an objective and unbiased way." *Id.*

Gordon "believe[d]" that Cubin's "comments on this particular legislation could give doctors . . . licensed by the Board . . . a reason to be concerned that [Cubin] might use [his] position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice." *Id.* So

5

to avoid "[e]ven the appearance of bias"—as well as the risk that "some may not appreciate that [Cubin's] personal comments might not necessarily be those of the Board as a whole"—Gordon concluded that Cubin should be "remove[d]." *Id.*

Cubin verbally resigned the same day and confirmed his resignation in writing four days later. Gordon "formally acknowledge[d] receipt of [Cubin's] resignation" on April 29, stating that it was "effective April 22." *Id.* at 35.

Cubin then sued Gordon in his personal and official capacities, raising § 1983 First Amendment retaliation and state-constitutional claims. He also moved for a preliminary injunction, which the district court denied. He then filed an interlocutory appeal of that decision.

While that appeal was pending, the district court granted Gordon judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[2] It held that Cubin's complaint failed to state a First Amendment violation under the *Garcetti*/*Pickering* framework. It further reasoned that even if Cubin had stated a claim, Gordon would be entitled to qualified immunity as to the personal-capacity claims.[3] With the federal claims resolved, the district court declined to exercise jurisdiction over the state-law claim and entered judgment in Gordon's favor.

Cubin filed this appeal and voluntarily dismissed his interlocutory appeal.

---

[2] A district court "retains jurisdiction to dismiss for failure to state a claim" while an appeal is pending from the denial of a preliminary injunction, even if the appeal asks us to "determine whether a claim has been stated." *Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 792 (10th Cir. 2013).

[3] The district court also ruled that Gordon wouldn't be entitled to Eleventh Amendment immunity from Cubin's official-capacity claims.

**Analysis**

Cubin's appeal from judgment on the pleadings presents two questions: (1) whether he stated a claim for First Amendment retaliation; and (2) if so, whether Gordon is entitled to qualified immunity in his personal capacity.[4]

We review "whether [Cubin] stated a claim under Rule 12(c) de novo, applying the same standards that apply to . . . dismissals" for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017). That is, we accept the nonmoving party's factual allegations, draw all reasonable inferences in that party's favor, and affirm judgment on the pleadings if the complaint fails to state "a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I.    First Amendment Retaliation

The First Amendment generally bars the government from "penaliz[ing] people] for what they say." *Timmins v. Plotkin*, 157 F.4th 1275, 1277 (10th Cir. 2025). That protection extends to public employees. *See Lane*, 573 U.S. at 231. Such employees "do not surrender their First Amendment rights by accepting" a job with the state—nor may the state "condition employment on the relinquishment of constitutional rights." *Id.* at 231, 236.

---

[4] The parties' briefing also addressed the preliminary-injunction denial. But at oral argument, Cubin conceded that portion of his appeal is moot, so we need not address it here.

7

Yet the "[s]tate has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. States, "like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Lane*, 573 U.S. at 236 (quoting *Garcetti*, 547 U.S. at 418).

To reconcile this tension, the Supreme Court set forth a framework for "balancing" an employee's interests against an employer's when a public servant objects to state sanctions on expression.[5] *Id.* at 237. To succeed on such a First Amendment retaliation theory, a public employee's claim must "establish" the *Garcetti/Pickering* framework's "five elements":

(1)     [t]he . . . speech was not made pursuant to an employee's official duties[;]

(2)     [t]he . . . speech addressed a matter of public concern[;]

(3)     [t]he government's interests as an employer did not outweigh the employee's free-speech interests[;]

(4)     [t]he . . . speech was a motivating factor in the adverse employment action[; and]

(5)     [t]he defendant would not have made the same employment decision in the absence of the . . . speech.

---

[5] Cubin's complaint alleged infringement of his First Amendment rights under both the speech and petition clauses. The *Garcetti/Pickering* framework applies to claims under either clause, so we analyze them together. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011) (endorsing application of *Garcetti/Pickering* to petition cases involving public employees).

8

*Timmins*, 157 F.4th at 1277.[6]

This appeal turns on the second and third elements. In the district court's view, Cubin's frustrations with a private organization were "not a matter of [public] concern," and Gordon's interests in "promoting efficiency" outweighed Cubin's First Amendment rights. App. vol. 1, 254–55. We take a different view of Cubin's email— it did deal with matters of public concern—and we conclude that any balancing of the interests was premature. Accordingly, we reverse the district court's holding that Cubin failed to state a First Amendment retaliation claim.

## A.    Matter of Public Concern

We begin with whether the speech dealt with matters of public concern. Cubin contends that his email did in fact address "a matter of public concern"—not, as the district court dubbed it, "a matter of personal interest." *Id.* at 255. We agree with Cubin.

A matter of public concern is one "fairly considered as relating to any matter of political, social, or other concern to the community, or . . . a subject of legitimate news interest." *Butler v. Bd. of Cnty. Comm'rs for San Miguel Cnty.*, 920 F.3d 651, 655–56 (10th Cir. 2019) (quoting *Lane*, 573 U.S. at 241). We determine whether speech meets that threshold by performing a "case-by-case" analysis of its "content,

---

[6] Although not relevant to this appeal, we note for clarity's sake that "[t]he employee has the burden of persuasion on the first four elements; the employer has the burden on the fifth"; and "[t]he first three elements are typically questions of law to be decided by the court, while the last two are typically factual issues decided by the jury." *Timmins*, 157 F.4th at 1277.

form, and context." *Id.* at 658. This inquiry goes beyond the speaker's words and their audience: we also consider "the motive of the speaker" and whether the speech "had a broader public purpose." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996).

Our precedent offers guidance in applying this litmus test. For example, speech endorsing "a particular candidate for public office," *id.*, or alleging "official impropriety generally involves matters of public concern," *Butler*, 920 F.3d at 663 (quoting *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1367–68 (10th Cir. 2015)). That said, "grievances of a purely personal nature," *id.* (quoting *Nixon*, 784 F.3d at 1367–68), or commentary on purely "internal structural arrangements and administrative procedures" of public entities will generally fall short of the mark, *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 992 (10th Cir. 1996). *See also Connick v. Myers*, 461 U.S. 138, 147–48 (1983) (describing plaintiff's survey of coworkers' morale and confidence in supervisors as extension of dispute over internal transfer and not matter of public concern).

Cubin's speech appears to pose a more difficult categorization question. On the one hand, the content of his email excoriated the *internal* processes of a *private* professional organization—facts that would tend to push speech outside the public-concern realm. We've considered similar critiques directed at public institutions, in which the public's interest is presumably higher, and concluded they failed to address matters of public concern. In *Clinger v. New Mexico Highlands University, Board of Regents*, for example, we addressed a faculty member's claim that she suffered

10

retaliation after she spoke out against a public university's leadership. 215 F.3d 1162, 1166–67 (10th Cir. 2000). We explained that her speech expressed a difference of opinion "with the Board of Trustees on the internal process they followed in selecting a president and reorganizing the [u]niversity" and that any public critique of officials was essentially a challenge to the university's "'internal workings,'" not a matter of public concern. *Id.* at 1166–67 (quoting *Bunger*, 95 F.3d at 992).

Gordon urges us to view Cubin's frustrations in that light: as personal grievances with the internal dynamics of the Society, a private organization. He highlights passages from Cubin's email critiquing the Society's internal workings, including: "the . . . Society has been . . . hijacked by the far left"; "[the leadership] ha[s] adopted and embraced 'woke' positions that are not congruent with the thoughts and opinions of the majority of the[] physician members"; and "[Society] membership was never polled," despite Cubin's requests "to do so." App. vol. 1, 30, 31. As Gordon sees it, because these personal grievances identified no "official wrongdoing[]," *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1251–52 (10th Cir. 2024), or problems of "public fi[nancing] . . . that transcended the internal [workings] of the [Society]," *Clinger*, 215 F.3d at 1167, Cubin's grievances mattered only to Society members.

On the other hand, Cubin raised these concerns in opposition to the Society's *public advocacy* against a bill Cubin *endorsed*—facts characteristic of "the type of core political speech the First Amendment was designed to protect." *Gardetto*, 100 F.3d at 812. Indeed, speech on matters of democratic debate is of paramount public

11

importance. We held in *Gardetto*, for instance, that a plaintiff's "public support of . . . three . . . candidates for positions on [a college's] board of trustees" "obviously involve[d] a matter of public concern." *Id.* Although there we extolled the "value [of] political speech in the electoral process," we see no reason to accord less importance to the legislative arena. *Id.* After all, "informed public opinion, . . . when transmitted to lawmakers, helps produce laws that reflect the [p]eople's will." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021).

Returning to its "content," *Lane*, 573 U.S. at 241, Cubin's email plainly "transmit[s]" his political views on the merits of Chloe's Law, *Mahanoy Area Sch. Dist.*, 594 U.S. at 190. Cubin posited that the banned procedures "take[] . . . patient[s] who [are] normal and make[] them abnormal," "will likely have negative effects on [patients] later in life," and should be restricted in order to "protect" children. App. vol. 1, 31. In support, he quoted the American College of Pediatricians' position on the issue. And he urged lawmakers to pass Chloe's Law without watering it down—a clear endorsement.

Even beyond the passages overtly endorsing the bill, Cubin's email contributed to the legislative debate. It impugned the Society's failure to poll its membership and discussed other professional organizations' views of gender-affirming care. In doing so, it informed lawmakers of potential weaknesses in the Society's testimony and its lobbying process. Though Cubin's statements about the Society arguably spoke to the internal workings of a private organization, that

12

organization's role in lobbying lawmakers on a pending bill made those criticisms relevant to the gender-affirming-care debate and the public at large.

The "form[] and context" of Cubin's speech only reinforce that assessment. *Lane*, 573 U.S. at 241. He emailed lawmakers directly about a bill pending before the state legislature. As such, his "statements were made in relation to and in the context of an important community discussion and not as part of" a separate dispute with the Society. *Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995). That counsels in favor of viewing his critique of Society leadership as a response to the organization's legislative testimony, rather than a purely personal issue. "[T]he mere fact that [Cubin's] statements related to a general grievance he had with [the Society] does not transform the statements into a matter solely of internal significance." *Id.*

In fact, Cubin's primary "motive" appears to have been supporting Chloe's Law. *Gardetto*, 100 F.3d at 812. So "[e]ven if personal grievances partially motivate[d]" his speech, Cubin's email on the whole "still involve[d] matters of public concern . . . because [the legislative process] interests the public." *Pryor*, 99 F.4th at 1251–52 (observing that speech identifying "official wrongdoings" addressed matter of public concern despite personal motives). That "broader public purpose" puts his speech firmly in public-concern territory. *Gardetto*, 100 F.3d at 812.

In sum, the content, form, and context of Cubin's speech all confirm that he was engaging in the debate over Chloe's Law. Cubin's speech was thus "motiv[ated]" by "a broader public purpose" and addressed a matter of public concern. *Id.*

13

### B.    Balance of the Interests

That leaves the remaining element on which the district court rejected Cubin's claims: *Pickering* balancing. The district court held that "the balance of interests weighs in . . . Gordon's favor" because "Gordon has a significant interest in assuring members of the Board can perform their . . . functions without perceived or actual bias," and Gordon "reasonabl[y] . . . predict[ed]" that "Cubin's extraneous comments to the Wyoming House . . . could cause the Board's impartiality to be questioned and disrupt at least some of the Board's core functions." App. vol. 1, 255, 259, 261. Cubin argues that this analysis, too, was wrong—that "[n]othing in [his] comments suggest[ed] he would lack impartiality," and even if something had, that the Board's recusal mechanism ensured any disruptions could be minimized. Aplt. Br. 30. We do not reach the merits of his argument, however, because we conclude that balancing the interests at the pleadings stage was premature.

*Pickering* balancing asks whether the government's needs as an employer "justifi[ed] . . . treating the employee differently from any other member of the public." *Rock v. Levinski*, 791 F.3d 1215, 1219 (10th Cir. 2015) (quoting *Lane*, 573 U.S. at 242). It requires us to weigh the state's interest in regulating its employee against the employee's interest in engaging in First Amendment activity. *Brown v. City of Tulsa,* 124 F.4th 1251, 1267 (10th Cir. 2025). The state's interest is highest when it seeks to regulate employees in positions of "'authority and public accountability'"; the employee's interest rises with the "importan[ce of] the speech

14

. . . to the public discourse." *Id.* at 1268 (quoting *Curtis v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998)).

We've recognized that the state's interest in "avoiding direct disruption" of its "internal operations" may "outweigh a public employee's recognized speech rights." *Id.* at 1267 (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)). We evaluate disruption by considering, among other things, whether the speech "impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 1268 (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007)).

Assessing disruption is "usually inappropriate—if not impossible—at the [pleadings] stage," however. *Id.* at 1269. This is because "[t]he information required to conduct *Pickering* balancing"—in particular, the actual or anticipated impact on the state—"is generally accessible only to the employer." *Id.* In rare cases, a plaintiff may plead facts which "provide[ courts] with an adequate basis to perform the *Pickering* balancing test." *Craig v. Rich Twp. High Sch. Dist.* 227, 736 F.3d 1110, 1121 (7th Cir. 2013). But in general, a complaint drafted "[w]ithout discovery" will lack the information necessary to address the disruption "side[] of the [*Pickering*] scale." *Brown*, 124 F.4th at 1269.

This is not the rare case. Cubin's complaint is characteristically short on facts about actual or potential disruption. It attaches Gordon's letter, which explained that Cubin's "comments on [Chloe's Law] could give doctors[] who are licensed by the Board . . . a reason to be concerned that [Cubin] might use [his] position to" advance

15

"an agenda." App. vol. 1, 33. As the district court found, this suggests Gordon was worried Cubin's partisanship would interfere with the Board's impartial consideration of licensing matters. We recognize the importance of preventing bias— and the appearance of bias—from infecting the Board's adjudicatory process. But apart from Gordon's letter, the pleadings do not flesh out that state interest or the ways Cubin's email frustrated it.[7] For example, on this record, we don't know how the recusal process works or how likely it is to lead to actual or anticipated disruption. Instead, the complaint alleges only that the email "did not in any way impair the efficiency or functioning of the . . . Board." App. vol. 1, 21. That is simply not enough to conduct *Pickering* balancing.

Accordingly, "the district court erred by jumping the gun on conducting the balancing test before the parties proceeded to discovery." *Brown*, 124 F.4th at 1270. We therefore reverse the district court's grant of judgment on the pleadings for failure to state a claim.

## II.    Qualified Immunity

With Cubin's First Amendment retaliation claims revived, we turn to qualified immunity. The district court granted Gordon qualified immunity from suit in his

---

[7] Nor can we look beyond the pleadings when reviewing a Rule 12(c) decision. *See BV Jordanelle, LLC v. Old Rep. Nat'l Title Ins. Co.*, 830 F.3d 1195, 1201 n.3 (10th Cir. 2016) (explaining that Rule 12(c) permits courts to consider documents outside complaint and its attachments only if the authenticity of the documents is undisputed and the documents are referred to in complaint).

personal capacity on the rationale that Gordon did not violate a clearly established constitutional right. Cubin says that was error. We disagree.

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane*, 573 U.S. at 243 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The doctrine protects officials from personal liability for violating a plaintiff's constitutional rights unless "the right was clearly established at the time of the challenged conduct." *Id.* (cleaned up) (quoting *al-Kidd*, 563 U.S. at 735).

"A right is clearly established if 'it would be clear to a reasonable [person] that his conduct was unlawful in the situation he confronted.'" *Clerkley v. Holcomb*, 121 F.4th 1359, 1366 (10th Cir. 2024) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Plaintiffs typically show this by identifying "a 'materially similar' published case from the Supreme Court or Tenth Circuit." *Brown*, 124 F.4th at 1265 (quoting *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017)). The case need not be "directly on point," *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *al-Kidd*, 563 U.S. at 741), but the Court has cautioned against defining rights "at too high a level of generality," *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).

Among other things, in this context, Cubin must show that it was "clearly established that [Cubin's] . . . speech [was] on a matter of public concern." *Singh v. Cordle*, 936 F.3d 1022, 1035 (10th Cir. 2019). As should already be clear, that's too tall an order.

17

At the very least, the proper classification of Cubin's email was up for debate. Some facts pointed to characterizing it as a private concern: the Society is a private organization, and Cubin's email raised personal gripes with its leadership and internal processes. Other facts pointed to a public-concern finding: Cubin expressed his support for Chloe's Law in an email sent to lawmakers debating the bill. In our analysis, we found the latter facts sufficient to survive the pleadings stage. But at the time of Cubin's removal, neither we nor the Supreme Court had explained, in any definitive way, how to classify speech about the internal workings of a private organization made in connection with that organization's position and testimony in an ongoing legislative debate. In that context, Gordon was entitled to rely on the closest authority available.

The Supreme Court's opinion in *Connick*—and our decisions in *Clinger* and *Gardetto*—supplied the best comparators for Cubin's email.[8] *Connick* considered a district attorney's inquiries concerning internal transfer policies and her colleagues' confidence in the office's leadership. *See* 461 U.S. at 143–49. *Clinger* dealt with a faculty member's criticism of the board of regents, the presidential appointment process, and an academic reorganization. *See Clinger*, 215 F.3d at 1166. And

---

[8] Cubin urges us to look to *Pryor*, 99 F.4th 1243, and *Duda v. Elder*, 7 F.4th 899 (10th Cir. 2021), as sources of clearly established rights. While those cases may support Cubin's view on other points, they do not address whether criticism of a private organization's internal workings can qualify as a matter of public concern. *See Pryor*, 99 F.4th at 1251–52 (classifying reports of official wrongdoing as matter of public concern); *Duda*, 7 F.4th at 911–12, 919 (classifying such reports and endorsement of political candidate as matter of public concern). Accordingly, we focus on precedents that, at the time, best approximated the facts here.

*Gardetto* addressed, in relevant part, a teacher's statements opposing layoffs of staff, criticizing internal budgetary decisions, and discussing methods for increasing enrollment. *See Gardetto*, 100 F.3d at 814–15. All three cases classified speech about the internal workings of public entities as outside the ambit of public concern.

Given that courts had declined to extend *Garcetti*/*Pickering* protection to speech at least superficially similar to Cubin's, none of these "precedents put [Gordon] on notice that his conduct violated the First Amendment." *Lane*, 573 U.S. at 244. Nor has Cubin identified other authority that put this issue "'beyond debate' at the time [Gordon] acted." *Id.* at 246 (quoting *al-Kidd*, 563 U.S. at 741). Accordingly, it was not clearly established that Cubin's email addressed a matter of public concern, and Gordon is entitled to qualified immunity in his personal capacity.

## Conclusion

Cubin's speech addressed a matter of public concern and *Pickering* balancing was premature, so we reverse the district court's judgment that Cubin failed to state a First Amendment retaliation claim. But Gordon didn't violate clearly established law, so we affirm qualified immunity for Gordon in his personal capacity.

We thus affirm judgment on the § 1983 claims against Gordon in his personal capacity; reverse and remand the § 1983 claims against Gordon in his official

capacity; and encourage the district court to consider exercising supplemental jurisdiction over the state-law claim on remand.

Entered for the Court

Nancy L. Moritz
Circuit Judge